Will the clerk please call the first case? 123-0526 W.C. Robert Blankshain, Appellant v. Illinois Workers' Compensation Comm'n, Walsh Construction Comp'n, Appellee. Consolidated for oral argument only with 123-0527 W.C. Robert Blankshain, Appellant v. Illinois Workers' Compensation Comm'n, Walsh Construction Comp'n, Appellee. John Popelka is Attorney for the Appellant. Peter Carlson is Attorney for the Appellee. Thank you. Mr. Popelka, you may proceed. Thank you, Your Honor. My name is John Popelka. I am here on behalf of the Appellant, Robert Blankshain, on two consolidated cases. In the first case, 1-23-0526, the Plaintiff alleges that the Commission erred in failing to award permanent total disability benefits under the Odd Lot Theory, that the Commission improperly denied maintenance benefits from August 24 of 2013 through April 1 of 2014, and again from November 1 of 2014 through May 9 of 2017, that the Commission improperly denied temporary partial disability benefits during the period that a Plaintiff worked at George Kennedy and Associates, or in the alternative to pay maintenance benefits during that time since he continued his job search, that the Commission erred in failing to award $41,665 for the cost of its finance degree, and that the Commission erred in failing to award penalties, attorney's fees, and costs for underpayment and nonpayment of benefits. With respect to the Odd Lot permanent total argument, both Plaintiffs' and Defendants' vocational experts testified to a reasonable degree of vocational certainty that Plaintiff conducted a diligent but unsuccessful job search for three and a half years, and there's no evidence to the contrary. In fact, the Commission awarded maintenance benefits during that three and a half year period. Both experts also testified that Plaintiff was unable to return to his former employment as an employee, and that his self-directed job search from February 1 of 2010 to May 10 of 2011 was diligent but unsuccessful. And then subsequently, after that initial self-directed job search, the Respondent had my client evaluated and interviewed by Dave Pat Savas, who put together a vocational program for him that essentially mirrored his self-directed job search. Both vocational experts testified that Plaintiff's job search, guided by Defendants' expert Dave Pat Savas from May 10, 2011 to August 23 of 2013, was diligent but unsuccessful. So based on this need to address Plaintiff's self-directed job search after the Defendant terminated the vocational program, the period from August of 2013 to May of 2017 when the case went to arbitration, the job search he did during that time was identical to his self-directed job search, but Plaintiff satisfied his burden of establishing that he falls within the odd-lot category by a preponderance of the credible evidence by this three-and-a-half-year period of diligent but unsuccessful job search. And the Commission, as I said, endorsed that job search by awarding maintenance benefits. So then the burden shifted to Defendant to show that Plaintiff was employable in a stable labor market and that such market exists. As Plaintiff's vocational expert testified, Defendant proved the unemployability of Plaintiff through the unsuccessful vocational program with Dave Pat Savas. That program included the use of professional headhunters, going to job fairs, and Defendant's inability, the employer, the employer's inability to place him in a job with them. Plaintiff applied for several jobs with the employer and was not accepted for any of them. He had a significant experience as an iron worker and he had a 4.0 from DePaul University with a finance degree. They're one of the largest contractors in the state, if not the country. They certainly, potentially, could have put him to work. But despite their financial incentive to do so and avoid a potential permanent total disability award, they were unable to do this. Excuse me. So Plaintiff respectfully petitions this court to award him an ODLAT permanent total disability benefit beginning the day after the termination of the vocational program on August 24 of 2013. If the court decides to do that, the arguments concerning maintenance benefits are unnecessary. But nevertheless, there was a maintenance period that was denied and Petitioner was not paid benefits after August 24 of 2013, or awarded benefits. So the Circuit Court in 2018 L050479, the first Circuit Court appeal, found that the Commission's determination with respect to the frequency of golf that Plaintiff played in assessing the adequacy of his job search was against the manifest way to the evidence. The reason? Because the defendant's evidence only showed that he played golf three times during the period of time that he worked with Dave Patsavis. And yet Dave Patsavis terminated the vocational program, not because of non-cooperation, according to his testimony, but because the defendant told him to stop. And he testified that Plaintiff could continue his self-directed job search thereafter in accordance with the dictates of nationality. What's interesting about the Commission's decision and denying benefits during this time also is that it found his job search defective because he was looking for higher paying jobs. And yet, during his initial period of job search, the self-directed period, he was looking for higher paying jobs, up to $100,000, and had more interviews and more luck with potential employment then, during that one year he did it on his own, than the two years he did, two and a half years with Dave Patsavis, who lowered the ask to $50,000 to $80,000. With respect to the vocational expenses, defendant's vocational expert testified that, to a reasonable degree of vocational certainty, that Plaintiff's finance degree allowed him to maximize his earning capacity, and that finance was endorsed in his vocational plan.  Plaintiff put out for his finance degree at DePaul was reasonable, and yet the Commission didn't award it based on Hunter. The distinguishing factor, though, in Hunter is, in Hunter, there was no evidence that a degree was a qualification to teach pipe fitting or plumbing, which is what the claimant wanted to do in that case. Here, there is evidence that the finance field was endorsed in his vocational plan, and that was all done by defendant's expert, in addition to Plaintiff's expert, and they both testified that the cost was reasonable. So, therefore, Hunter is clearly distinguishable. With respect to penalties and attorney's fees, defendant reduced Plaintiff's rate from $1,000 to the permanency rate, $636.15, after terminating the vocational program on August 23, 2014. Dave Patsavis testified that Plaintiff would no longer benefit from his services, but could continue a self-directed job search on his own, which Plaintiff did, and there's evidence in the record of that, significant evidence. In December of 2014, approximately three, four months later, defendant terminated all benefits based on the report from Dave Patsavis that said that Plaintiff's golf activities detracted from his job search performance. As I said earlier, they only documented three rounds of golf that he played while working for Patsavis, but Plaintiff didn't hide his golf from Patsavis. They talked about it several times. Plaintiff would get up at three in the morning to begin his job search, would work through noon, and then would golf in the afternoon. He did it seven days a week for seven years. The Circuit Court in 2018 found that the Commission's reliance on this report about the golf was against the manifest way to the evidence that was never repealed. It was unreasonable for defendant to reduce Plaintiff's disability rate from $1,000 to $636.15, where the Plaintiff continued his self-directed job search as directed by Dave Patsavis. It was equally unreasonable to terminate his payment of benefits based on the fact that they had evidence of golf, but apparently didn't really look closely at that evidence to determine what they had. So Plaintiff requests an award of penalties and attorney's fees as set forth in pages 43 and 44 and it's brief. I've done the calculations. With respect to the second case, the issue in that case is whether the Commission erred in denying the bilateral MR arthrograms ordered by Dr. Marra on August 3rd of 2021. Excuse me. The Commission's June 18, 2021 decision on remand specifically authorized Plaintiff to have follow-up visits with Dr. Marra. The respondent authorized the visit with Dr. Marra's office. After Dr. Marra ordered the test, defendant emailed the doctor's office denying authorization. The Commission reasoned that the Circuit Court decision, the 2021 decision, which remanded, or the 2018 one, which remanded matter back to them, affirmed the Commission's prior determination that Plaintiff was at MMI, implying that generally no prospective treatment was necessary. And the Commission concluded that if Plaintiff wanted to proceed with any additional prospective medical treatment, a petition under Section 19H would be more appropriate to do that than a petition under Section 8A. And the Commission concluded that Plaintiff had not indicated in any way that his condition had fundamentally changed or deteriorated in any way since the prior decision. I think this should be a de novo review. As the Supreme Court indicated in F&G v. Industrial Commission, the intent of Section 8A is to make the employer's liability continuous so long as they are required to relieve the injured employee from the effects of his injury. He was complaining of increased bilateral shoulder pain. That's the case. That's the condition that he treated for throughout the course of this case. The respondent did put in some evidence from Dr. Arabindi. He did do a report after examination. He concluded the tests were not necessary, but he based it on his prior report. And as we know, his prior report was disregarded by the Commission when they awarded Plaintiff prospective medical care. The Commission didn't cite any authority for its conclusion that if Plaintiff wants to proceed with additional prospective medical care, he should avail himself of a petition under Section 19H, no case law, no statute. Petitioner respectfully petitions this Court to reverse the Commission decision and order defendant to authorize and pay for EMR arthrograms and follow-up care with Dr. Marra, as well as all other proper relief. Thank you. Any questions from the Court? Okay. You'll have time in reply, Mr. Popelka. Thank you. Mr. Carlson, you may respond. Thank you, Your Honors. My name is Peter H. Carlson. I'm with the law firm of Henshaw and Culbertson. I represent Walsh Construction in this case. I thank you for your time. I thank counsel for his time. Our position in this case for many years was that Mr. Blankshain was capable of working full duty as an ironworker. We prevailed on that issue initially in front of the arbitrator, but ultimately, the Commission indicated that he could not work as an ironworker. I point that out because it underscores his substantial physical abilities, which were he was able to lift over 100 pounds, including 50 pounds over the shoulder and overhead. I would point out further that in addition to that, he was found on surveillance to be engaged in significant heavy activities, including activities involving gardening and landscaping where he was lifting substantial items of mulch and trees. The arbitrator noted that in the initial decision and the Commission has adopted and incorporated the vast majority of the arbitrator's decision as its own. The only change they made with respect to the findings was essentially that they raised the PPD amount from 30% of a person to 45% and they based it on the fact that they thought there were some restrictions that would prevent him from returning to ironwork. However, Dr. Marra indicated that he could give it a try and that he was physically able to do heavy work. To the contrary, Mr. Blankshain, from the very beginning of this case, since he had the FCE and in terms of his interactions with all the vocational counselors and his testimony before the Commission, has always been indicating that he's physically unable to do physical work. That affected his job search, that affected his credibility with respect to the Commission. It was also inconsistent with the surveillance activities. And can I interrupt you for a minute? Yes, sure. Is it your contention that the Commission heard when they found that he couldn't work as an ironworker? No. Well, we disagreed with that, but we did not review that, Your Honor. We accepted that decision by the Commission and we did not review that. So I'm pointing that out, but I'm not seeking a review based on it or appeal. Okay, go ahead. Thank you, thank you. With respect to the job search, Mr. Popelka points out various arguments that Mr. Blankshain did not find a job and that maintenance benefits were awarded during multiple periods over three and a half years. Even if that essentially is a prima facie case for permanent total disability, it's amply refuted by the evidence in the record that Mr. Blankshain has a stable market for him and his services and he has substantial earning capacity. In fact, I would submit to this court that there is no evidence from anybody that he can't work and earn in a stable market. Mr. Blankshain testified that he can. Mr. Grezek, his vocational expert, said there was a stable market for him. Obviously, Mr. Patsavis, Walsh's vocational expert, said that he didn't even have any earning capacity diminishment. There is no evidence from anybody in this case that there's no stable labor market for him to work. Even if there is a prima facie case that he couldn't find a job, and we dispute that because of the job search dispute I'm going to get to in a second, it's amply refuted by the record. It's not automatic. He just gets permanent total disability under the law. It can be refuted and it has been by all the evidence in the case. He can do 90% of all jobs at the heavy level. He earned $250,000 previously as a vice president at Wachovia Bank. He was a 4.0 in DePaul Finance. He's an incredibly talented person. And so the commission found that, and it's in their discretion to find this, that he is able to work and they rejected Mr. Popelka and Mr. Blankshain's argument that he's permanently disabled. And that's not against the manifest weight of the evidence. It's amply supported by all of the evidence in this case. With respect to the job search, I want to get into that a issue. Yes, Walsh paid benefits and we paid for the vocational expert, Mr. Patsavis to assist him. And so the arbitrator in the commission noted that we didn't contest his job search early on, and we didn't contest it during the period where Mr. Patsavis worked with him. So benefits were Mr. Blankshain. Additionally, with respect to the job duties and the vocational program, it was terminated not because of golf. It was terminated because at that point, Mr. Patsavis had recommended and indicated that there was nothing more that he could do for him with respect to the job search. And so it was stopped at that point. I would point out further this is where the golf comes into it. At that period of time, our investigation revealed that Mr. Blankshain golfed 21 times over about 60 days right in there. And that was excessive. And when that was brought to the attention of Mr. Patsavis, he said, yes, that would interfere with the program. He did bring it up, but he wasn't telling me that he was golfing three times a week. And also what Mr. Popelka said, well, you know, he was doing his job search from 3 a.m. to 11. Our surveillance had several indications where he was going off to golf at 10 a.m. or even eight o'clock. And so the arbitrator noted, and it's within the arbitrator and the commission's discretion to find that that did interfere with the job search. Additionally, for the later periods in terms of his self-directed job search, he did not, he went back to looking for work only at the $100,000 level instead of a different level that both his own vocational counselor and Mr. Patsavis said was appropriate. Also, he completely refused to look for any work with respect to physical demands or physical abilities. Even though he could do 90% of the jobs, he completely eliminated that from his job search, his self-directed job search. And so the commission found- Mr. Carlson, did he explain why? I'm sorry, your honor. Did he explain why he eliminated that? The physical demands? Yeah, in his job search, just what you said. Well, he indicated early on in response to the FCE and to both vocational counselors that he said he had substantial pain associated with his physical abilities and therefore didn't want to do anything physical. And that's what he testified to in front of the commission. That's what he told both vocational counselors. He didn't want to do it. It was his choice not to do it. We understand that, but he can't then say he's permanently disabled when he can physically do all that work according to the experts and the doctors. Dr. Mara said he could do it. Thank you. Thank you. I'm sorry. I haven't gone through my time, have I? No. You're still on green light. Okay, thank you. With respect to his earning capacity, and I'm not sure if there's still a wage differential claim being made here. Counsel didn't argue that. He didn't argue that to the commission. But I just want to point out, because this is my only opportunity to speak on this, and I pointed out in my brief, there was a decision made by arbitrator Soto that the specifically found also that the job at George Kennedy and Associates was not a suitable job. He was underemployed. And that's a finding by the commission. And there's evidence to support that. Mr. Pat Savas said that was well below his earning capacity. And so that argument was not presented to the commission. And I didn't see it again, until the circuit court. So then I argued at that point, that had been abandoned and had not been preserved. But the point I would make, to your honors, is that the commission essentially has ruled by adopting the arbitrator's decision, that a wage differential is not awarded in this case, they made a decision to go with 45% of a based upon a loss of occupation. And that's within their discretion. And that's within the manifest way to the evidence. And that should be supported. I cite, there's I did bring to your honors attention, the Lenhart case is something relevant. But we believe it's distinguishable based upon the facts of that case. In that case, there were arguments to the commission made by parties, that a wage differential was appropriate. Here, it was dropped and ruled on. And there's evidence to support under the Crittenden case, there's no suitable employment that has been presented by petitioner. And essentially, the argument has been abandoned. But I just want to make that argument, even though counsel didn't address that it was in his brief, and I wanted to point that out. The Crittenden case that I cite does say that without suitable employment, there can be no wage differential. And there's plenty of evidence in the record from Mr. Patsavis' labor market survey. And the commission found that Mr. Patsavis was more credible than Mr. Grezik. That's a factual determination that the commission can make. And Mr. Patsavis did a labor market survey, some of the jobs go up to even $54 an hour. If you do the math, I realized that his deposition, he testified that the earning capacity was from 26 to 42 15. But he also indicated at various points in his deposition and in his reports, that it could be higher, given the fact that we're dealing with really a superlative vocational candidate here with a 4.0, a prior vice president of Wachovia. And he was able to do 90% of all available work based upon the skill train, not only physically, but also based on skillset. He never went back to the union in terms of, you know, looking at other opportunities, physical opportunities, welding, for instance. And yet we have them on surveillance doing heavy landscaping work. That goes to the point of the commission made a decision that Mr. Blanchine was not credible. And they, in fact, in their, in the body of their decision, found that he intentionally made a bad faith job search. And that's a factual finding that they're entitled to make. And we would submit that based upon the evidence, that's not against the manifest way to the commission. With respect to the vocational expense to get the DePaul degree, he started doing that long before he was even at MMI, before he had any restrictions, he was doing that. And the vocational counselors never put it in their plan saying that's he had to have as part of a plan. So it fails under Hunter. And that's within the discretion of the commission, which ruled that and the circuit court ruled that. And we would submit to you that, you know, we take the claimants as we find him, he had the degree. And so yes, it was utilized, but it wasn't necessary according to Mr. Pat Savas. And I don't even think it was according to Mr. Grezik. So we believe that the commission ruled properly on that issue. With respect to the MRI case, you know, there's, there have been many, many findings with respect to MRIs. And after the last MRI in, I think it was in 2014, both doctors had said that petitioner was at MMI. And when the case went back on remand from this, from the appellate court, after the circuit court ruling, the only thing that was awarded was the follow up visits with Dr. Mara and the Celebrex, which we approved. However, the MRI, we disputed based upon the fact that according to Dr. Arabendi, it's, it's not related. There was a causation dispute and it wasn't reasonable and necessary. Dr. Arabendi's opinion, Mr. Carlson, your time has expired. The red light is on. Okay. Thank you for your time. Would you want to summarize just quickly? Thank you. Thank you. So essentially on the, on the MRI, there's a causation dispute there. The discretion of the commission. Overall, the commission had evidence in this case to rule the way it did. There's a huge record. And we would ask that, that your honors consider this huge record with respect to all the evidence that supports their decision. Thank you for your time. Thank you, Mr. Carlson. Any questions from the court? Mr. Carlson? No. Mr. Popelka, you may reply. Thank you, your honor. First, with respect to the plaintiff's physical capabilities in terms of his vocational search, we do concede that he limited himself in his job search, but at the same time, both vocational experts testified that this was appropriate. They testified that to a reasonable degree of vocational certainty. So defendant's argument is undermined and contradicted by its own vocational expert who interviewed plaintiff and put in place a vocational plan that limited plaintiff to looking for employment based almost entirely on his finance degree, rather than seeking physical lower paying jobs. And when Mr. Patsavis was asked on cross-examination about that, he conceded, actually on redirect, he conceded that he never felt it was appropriate for petitioner to have, quote, changed gears to try a different job search other than looking for these finance type positions. So that argument is completely undermined. With respect to the fact that counsel had indicated that my client was a vice president at Wachovia, he was a stockbroker. He did well as a stockbroker at one point in his life, but there were a number of different factors that led to his withdrawal from that occupation and his eventual becoming of an arbiter or an iron worker. That was discussed with Dave Patsavis. How did you get past that? Did you specifically counsel him how to address that in interviews? He did not. As a matter of fact, Dave Patsavis conceded that he had no personal contact with any of plaintiff's potential employers to say what the reasoning was for not hiring him. He didn't do a good job. Also at the same time, you've got an employer here who employs thousands and under any other circumstance would love having someone with 10 to 15 years of iron work experience in the field who also has the mental capability to get a 4.0 in finance from DePaul. And they decided not to take him back, even though he applied to at least three, if not four positions with them. With respect to the gulf and the surveillance of having him at 10 AM, it's a minor matter, but there is no such surveillance that's in this record. Counsel is claiming that there's a reasonably stable labor market for my client at $56 per hour. That translates to $116,480 a year. He was looking for jobs in the $100,000 range on his own, but then Dave Patsavis told him, we need to drop that down to 50 to $80,000. You can't on the one hand, change his job focus. And then on the other hand say, but there is a reasonably stable labor at $116,480 for him. It just doesn't work that way. Mr. Blankshain already had his finance degree by the time he started working with Dave Patsavis. He testified that early on after the respondent had sent him to Dr. Mara and Dr. Mara became his advisor. Dr. Mara said, you're not going back to iron work with these shoulders. And at that point on his own, he did enroll at DePaul and decided to pursue the finance degree. In summation, petitioner respectfully requests the relief that we've outlined in our briefs. Thank you. Questions from the court. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement.